Howard M. Privette (SBN 137216)
hprivette@swlaw.com
Jason Spitalnick (*pro hac vice forthcoming*)
jspitalnick@swlaw.com
Justin F. Mello (SBN 329514)
jmello@swlaw.com
SNELL & WILMER LLP
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
Telephone:    714.427.7000
Facsimile:    714.427.7799

*Attorneys for Plaintiffs*
*Midnight VP Fund I, L.P. and Worth the Squeeze L.P.*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIDNIGHT VP FUND I, L.P., a Delaware limited partnership; and WORTH THE SQUEEZE L.P., a Delaware limited partnership, | Case No. |
| Plaintiffs, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| SIERRA AGRA USA, LLC, a California limited liability company; WADE O. WATSON, an individual; JOHN GORMAN, an individual; and NATHAN REVENAUGH, an individual, | |
| Defendants. | |

COMPLAINT

4938-2980-8822

Plaintiffs Midnight VP Fund I, L.P. and Worth the Squeeze L.P. (together, "Plaintiffs") allege as follows:

## SUMMARY OF COMPLAINT

This is a securities fraud and breach-of-contract action arising from a $14 million private offering in which Sierra Agra induced sophisticated investors to fund a produce-processing facility that, as the Company's own executives well knew, could not lawfully operate. In 2024, Sierra Agra—acting principally through its CEO, Wade Watson, and its CFO, John Gorman, with the active support of its V.P. of Administration, Nathan Revenaugh—solicited Plaintiffs to purchase Select 2023-B units, representing that the facility was on the verge of commercial operation and would generate roughly $20 million in revenue in 2024.

Those representations were false when made. To install and operate its processing lines, Sierra Agra was required to obtain a battery of governmental permits—from the City, the County, and air, sanitation, and fire authorities. Yet as of Plaintiffs' September 2024 investments, Sierra Agra had not even applied for those permits, and critical systems—power, ammonia refrigeration, wastewater monitoring, and the Line 2 boiler—remained months from completion. Commercial operation on the timetable Defendants touted was a legal, technical, and financial impossibility.

Defendants concealed these facts and conveyed the opposite—through investor decks and a financial model projecting imminent operations and tens of millions in 2024 revenue, through in-person and videoconference presentations, and through the Unit Purchase Agreement's express warranty that Sierra Agra had or would have all necessary permits. The UPA contained additional warranties that were equally false, concerning undisclosed insider transactions, an undisclosed agreement to issue units, an existing loan default, and an existing lease default.

Defendants' knowledge is established by their own words and conduct. In a June 2025 verified complaint, Watson and Gorman admitted under penalty of perjury that they had known for "approximately two years"—a period spanning the offering—that Sierra Agra's failure to obtain permits was a "critical compliance failure" that "needlessly put . . . [Sierra Agra's] massive capital investment at risk." On June 25, 2025, the concealed risk materialized: the City issued a Stop Work Order halting all activity at the facility for the very permitting failures Defendants had hidden.

COMPLAINT

4938-2980-8822

As a direct result, Plaintiffs' investments have been rendered worthless. Plaintiffs bring claims for breach of contract, violations of Section 10(b) and Rule 10b-5 and Section 20(a) of the Securities Exchange Act, common law fraud, and violations of the California Corporate Securities Law, and seek compensatory and punitive damages, rescission, and related relief.

**PARTIES**

1.      Plaintiff Midnight VP Fund I, L.P. ("MVP") is a Delaware limited partnership having its principal place of business in Austin, Texas. MVP invested in Sierra Agra USA, LLC, as set forth below.

2.      Plaintiff Worth the Squeeze, L.P. ("WTS") is a Delaware limited partnership having its principal place of business in Austin, Texas. WTS invested in Sierra Agra USA, LLC, as set forth below.

3.      Defendant Sierra Agra USA, LLC ("Sierra Agra") is a California limited liability Company having its principal place of business in Fresno County, California.

4.      Defendant Wade O. Watson ("Watson") is an individual residing in Tulare County, California.

5.      Defendant John Gorman ("Gorman") is believed to be an individual residing in Houston, Texas.

6.      Defendant Nathan Revenaugh ("Revenaugh") is an individual residing in Tulare County, California.

**JURISDICTION AND VENUE**

7.      This Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the case arises "under the Constitution, laws, or treaties of the United States." In particular, Plaintiffs allege that Defendants violated 15 U.S.C. §§ 78j & 78t and 17 C.F.R. § 240.10b-5.

8.      This Court has supplemental jurisdiction over the remaining claims for relief because said claims "are so related to claims in the action within . . . original jurisdiction that they form part of the same case or controversy[.]" 28 U.S.C. § 1367.

///

COMPLAINT

4938-2980-8822

9. This Court has personal jurisdiction over each Defendant because (a) Sierra Agra is a California limited liability company with its principal place of business in this District; (b) Watson and Revenaugh are both residents of California and reside in this District; and (c) Gorman, although a resident of Texas, served as an officer of a California company, purposefully availed himself of the privilege of conducting business in California, and conducted the fraudulent acts alleged herein with respect to a California-based venture in this District, thereby creating a substantial connection with this forum.

10. Venue in this District is proper under 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim occurred" in this district and under 15 U.S.C. § 78aa because this is the district "wherein the defendant is found or is an inhabitant or transacts business[.]"

**GENERAL ALLEGATIONS**

**I.   SIERRA AGRA IS ORGANIZED IN 2019 TO ENGAGE IN THE FOOD PROCESSING BUSINESS**

11. Sierra Agra was organized as a manager-managed California limited liability company on December 16, 2019.

12. At all relevant times, Sierra Agra's core business plan was to process culled produce into commercial byproducts using large-scale industrial fruit and vegetable processing machinery.

13. At all relevant times, Sierra Agra has been governed by a Board of Managers ("Board").

14. Watson was Sierra Agra's chief executive officer from its founding until February 2025.

15. Watson was a member of the Board from its founding until his removal in May 2025.

16. Gorman was Sierra Agra's chief financial officer from its founding until February 2025.

17. Gorman was a member of the Board from its founding until his removal in May 2025.

COMPLAINT

4938-2980-8822

18.     As Sierra Agra's CEO and CFO, Watson and Gorman were primarily responsible for conducting Sierra Agra's business during the time period at issue in this complaint.

19.     Revenaugh was Sierra Agra's V.P. of Administration during the time period at issue in this complaint. Watson presented Revenaugh as the operational point person dealing with office and plant personnel, and Revenaugh routinely served as a Sierra Agra point of contact with outside vendors, contractors, and consultants on operational and infrastructure matters. Revenaugh is Watson's nephew. In essence, Revenaugh served as Watson's additional eyes, ears, and mouth when Watson was not present in a meeting or when Watson needed information from company communications. In particular, Revenaugh had access to, and at times actively monitored, company-wide emails including communications relevant to this complaint.

20.     During the period at issue in this complaint, Sierra Agra's business activities were predominantly focused on (a) construction and installation work related to Sierra Agra's processing machinery (including obtaining permits, licenses, and authorizations related to the same) and (b) raising capital from outside investors.

21.     In or about August 2021, Sierra Agra executed a lease ("Lease") for commercial space at 3194 E. Manning Ave., Fowler, CA 93625 (the "Facility") with non-party The Reed Family Trust ("Reed Trust"). The Reed Trust is an affiliate of non-party Lorin Reed.

22.     Reed invested in Sierra Agra through family affiliates (including the Reed Trust), and Reed personally served as a member of the Sierra Agra Board from 2021 through May 2025. Reed is the owner and president of Packline Technologies, Inc. ("Packline"), a specialized manufacturer that designs and builds custom processing and packaging machinery for the fresh produce industry. Packline occupied (and still occupies) a portion of the Facility.

23.     Sierra Agra's commercial plans turned on installing and operating multiple culled produce processing lines ("Lines") at the Facility.

24.     At the time of the Lease, Sierra Agra, Watson, Gorman, and Reed were aware that, to install and operate the Lines at the Facility, Sierra Agra would have to undertake substantial alterations to the Facility.

///

- 5 -                                    COMPLAINT

4938-2980-8822

25.    To undertake the alterations required to install the Lines and commence commercial operations, Sierra Agra was required to obtain various government agency permits, licenses, approvals, and authorizations (collectively, "Permits").

26.    The contemplated alterations required Sierra Agra to submit a site review plan to the City of Fowler ("City").

27.    Without City approval of the site review plan, Sierra Agra would not be permitted to proceed with alterations required to install the Lines.

28.    At the very least, without approval of the site review plan, Sierra Agra could not lawfully conduct commercial operations at the Facility.

29.    Sierra Agra needed to obtain a commercial building permit from the City to undertake alterations needed to install the Lines and support the operation of the Lines.

30.    Before commencing interior demolition work at the Facility, Sierra Agra had to obtain a demolition permit from the City.

31.    Sierra Agra was required to comply with the National Emission Standards for Hazardous Air Pollutants, as enforced by the San Joaquin Valley Air Pollution Control District ("Pollution Control District").

32.    Specifically, Sierra Agra was required to conduct an asbestos survey and obtain a demolition/renovation release from the Pollution Control District.

33.    The planned alterations and Line installations also required Sierra Agra to obtain various sub-trade permits such as electrical permits, plumbing permits, and mechanical permits.

34.    Sierra Agra was further required to submit architectural plans to the Fresno County Department of Public Health, Environmental Health Division ("County") for review and approval.

35.    Because Sierra Agra's contemplated juicing operations would generate high-strength industrial wastewater, Sierra Agra was required to obtain an industrial wastewater discharge permit from the Selma-Kingsburg-Fowler County Sanitation District ("Sanitation District").

36.    Additionally, any alterations to the fire suppression and alarm systems would require Sierra Agra to obtain permits from the Fresno County Fire Protection District ("Fire

- 6 -                                COMPLAINT

4938-2980-8822

District").

37.    The installation of any sufficiently powered industrial boiler at the Facility constituted a new stationary source of air emissions subject to the jurisdiction of Pollution Control District.

38.    Accordingly, Sierra Agra was required to obtain an "authority to construct" from the Pollution Control District prior to commencing installation of any given boiler.

39.    Following the installation of the boiler, Sierra Agra was required to demonstrate compliance with emission standards to obtain a permit to operate from the Pollution Control District.

40.    Upon completion of all permitted work and final inspections by the various government agencies, Sierra Agra was required to obtain a certificate of occupancy from the City to occupy the Facility legally and commence commercial produce processing operations.

41.    As Sierra Agra executives and members of the Board, Watson and Gorman knew that these various Permits were required to proceed with Facility alterations, installation of the Lines, and commencement of commercial operations.

42.    As Sierra Agra's V.P. of Administration, Revenaugh knew that these various Permits were required to proceed with Facility alterations, installation of the Lines, and commencement of commercial operations. Revenaugh served as a Sierra Agra point of contact on the infrastructure required to operate the Lines, including the Line 2 boiler and the electrical power supply. In late 2022 and early 2023, Revenaugh had communicated directly with Sierra Agra's plumbing and gas contractor regarding "the boiler requirements for line 2," and he was repeatedly asked to provide detailed electrical load data for Lines 1 and 2 needed to advance the Facility's power supply with Pacific Gas & Electric. Through this involvement, Revenaugh knew that the boiler and power infrastructure necessary to operate the Lines required governmental permits and authorizations that Sierra Agra had not obtained.

43.    Non-party Reed, as a member of the Sierra Agra Board, as an ultimate owner of the Facility, and as a person with significant experience in the produce industry through Packline, also knew that these various Permits were required to proceed with Facility alterations, installation of

- 7 -                                    COMPLAINT

4938-2980-8822

the Lines, and commencement of commercial operations.

44.     At times relevant to this complaint, Reed discussed permitting requirements and related issues with Watson and Gorman.

45.     The equipment for the Lines was manufactured by Tropical Food Machinery ("TFM"), an Italian manufacturer.

46.     In or about August 2022, Sierra Agra took delivery at the Facility of TFM equipment that would, when installed, constitute Line 1.

47.     As of the time the Line 1 equipment was delivered, Sierra Agra had not submitted a site review plan to the City or applied for any Permits from the City, the County, the Pollution Control District, the Sanitation District, or the Fire District.

48.     Nevertheless, Sierra Agra undertook alteration work to the Facility, and performed installation work for the Lines, after taking delivery of the Line 1 equipment.

49.     In or about May 2023, Sierra Agra began taking delivery at the Facility of TFM equipment that would, when installed, constitute Line 2.

50.     At the time of the delivery of the Line 2 equipment, Sierra Agra had not submitted a site review plan to the City or applied for any permits, licenses, or other authorizations/approvals from the City, the County, the Pollution Control District, the Sanitation District, or the Fire District.

51.     Nevertheless, Sierra Agra continued performing alteration work to the Facility, and performing installation work for the Lines, after taking delivery of the Line 2 equipment.

52.     The Facility alteration work Sierra Agra performed without receiving Permits included, without limitation, work on: interior concrete demolition; installation work on Line 1 and Line 2; building an icer chiller platform and system; installing an exterior pipe rack; building an ammonia platform and system; and building a roof platform and staircase tower.

## II.      THE 2024 SECURITIES OFFERING

53.     In or about the spring of 2024, representatives of MVP were introduced to representatives of Sierra Agra—including Watson—for the first time.

54.     From that introduction until Plaintiffs' investments in the fall of 2024 (the "Solicitation Period"), Sierra Agra—primarily through Watson and Gorman, with active support

COMPLAINT

4938-2980-8822

from Revenaugh—undertook an active effort to solicit Plaintiffs' investments.

55.    That solicitation, and Plaintiffs investments, were part of a Sierra Agra securities offering (the "Offering") to raise capital for, among other things, the continued installation of the Lines and the commencement of Sierra Agra's commercial operations.

56.    The Board—including Watson, Gorman, and Reed—authorized the Offering.

57.    The Offering was conducted subject to a private placement exemption under the federal securities laws.

58.    Sierra Agra raised approximately $14 million in the Offering from investors through the sale of Select 2023-B membership units at $82,608.70 per unit.

59.    MVP purchased 12 Select 2023-B membership units in the Offering.

60.    MVP paid $991,304.40 for its units.

61.    WTS purchased 108 Select 2023-B membership units in the Offering.

62.    WTS paid $8,921,739.60 for its units.

63.    In the course of the Offering, Watson and Gorman each solicited Plaintiffs' investments in several ways—including by interstate telephone calls and emails to representatives of MVP and WTS, by providing MVP and WTS internet access to a virtual data room, and by making in-person presentations and interstate videoconference presentations to representatives of MVP and WTS.

64.    In soliciting Plaintiffs' investments during the Offering, Watson and Gorman provided Plaintiffs with numerous documents purporting to contain truthful factual information about Sierra Agra and its anticipated commercial operations and resulting finances.

65.    In soliciting Plaintiffs' investments during the Offering, Revenaugh made in-person presentations to representatives of MVP and WTS detailing Sierra Agra's operations, including in-person introductions to, and meetings with, Sierra Agra personnel responsible for quality assurance and regulatory compliance, all conveyed to representatives of MVP and WTS for the purpose of confirming that Sierra Agra was ready to commence operations.

///

///

COMPLAINT

4938-2980-8822

**III.    THE UNIT PURCHASE AGREEMENT**

66.    Sierra Agra sold the Select 2023-B units to MVP, WTS, and other investors pursuant to a "Select 2023-B Unit Purchase Agreement" ("UPA"). A copy of the UPA is attached as **Exhibit 1**.

67.    Upon information and belief (including based on their roles as executives and their essential roles in soliciting Plaintiffs' investments), both Watson and Gorman were personally involved in the drafting and/or review and approval of the UPA.

68.    Sierra Agra engaged outside counsel in connection with the Offering and the drafting of the UPA.

69.    Upon information and belief, Watson and Gorman worked with Sierra Agra's outside counsel on Offering-related matters—including the drafting and ultimate approval of the UPA.

70.    Upon information and belief, and consistent with his role as V.P. of Administration with responsibility for the Company's administrative and operational matters, Revenaugh reviewed the UPA and was aware of its contents, including the representations and warranties contained therein.

71.    Paragraph 2 of the UPA provides, in pertinent part: "The Company hereby represents and warrants to each Purchaser that, except as set forth on the Disclosure Schedule attached as Exhibit C to this Agreement . . . the following representations are true and complete in all material respects as of the date of each Closing."

72.    Paragraph 2 contains a series of representations and warranties made by Sierra Agra to each Plaintiff.

73.    UPA ¶ 2.2(c) provides, in pertinent part: "[T]here are no . . . agreements, orally or in writing, to purchase or acquire from the Company any Units, or any securities convertible into or exchangeable for Units."

74.    UPA ¶ 2.9 provides, in pertinent part: "The Company is not in violation or default . . . (iii) under any note, indenture or mortgage . . . to the extent any such violation of or default . . . would reasonably be expected to have a Material Adverse Effect."

COMPLAINT

4938-2980-8822

75. UPA ¶ 2.11(a) provides, in pertinent part: "[T]here are no agreements, understandings or proposed transactions between the Company and any of its officers, managers, consultants, or Key Employees, or any Affiliate thereof."

76. UPA ¶ 2.11(b) provides, in pertinent part: "None of the Company's managers, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company[.]"

77. UPA ¶ 2.13 provides, in pertinent part: "With respect to property and assets it leases, the Company is in compliance with such leases and, to its knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets."

78. UPA ¶ 2.15(i) provides, in pertinent part: "Since June 30, 2024, there has not been . . . any loans or guarantees made by the Company to or for the benefit of its employees, officers or managers, or any members of their immediate families, other than travel advances and other advances made in the ordinary course of its business."

79. UPA ¶ 2.19 provides, in pertinent part: "The Company has or will have when necessary all permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a Material Adverse Effect."

80. Sierra Agra, Watson, Gorman, and Revenaugh intended and knew that Plaintiffs would rely on these and other representations and warranties in the UPA in purchasing Select 2023-B units.

**IV.   SIERRA AGRA, WATSON, GORMAN, AND REVENAUGH CONCEALED THE FACT THAT SIERRA AGRA COULD NOT COMMENCE COMMERCIAL OPERATIONS**

81. Throughout the Solicitation Period, Sierra Agra, Watson, Gorman, and Revenaugh conveyed to Plaintiffs—verbally and in writing—that Sierra Agra would imminently commence commercial produce processing operations to generate substantial revenues in 2024.

82. In doing so, Watson, Gorman, and Revenaugh concealed at least two sets of material facts.

COMPLAINT

4938-2980-8822

83. The first concealed set of material facts was that Sierra Agra did not have the Permits required to lawfully conduct processing operations at the Facility, and would not have those Permits in time to generate *any* significant revenues in 2024, let alone the tens of millions of dollars projected for 2024 in the materials dated February and June 2024 that were provided to Plaintiffs by Defendants prior to their investment in September 2024.

84. The second concealed set of material facts was that multiple systems required to support the Lines and the potential commercial operations at the Facility were not complete; that the installation of those systems could not be completed in time to conduct processing operations lawfully at the Facility in the manner required to generate any significant 2024 revenues; and that substantial additional capital expenditure (requiring additional fundraising) would be required to complete those systems in a manner conducive to commercial operations.

85. Concealing these material facts rendered certain representations made to Plaintiffs false and misleading.

86. In or about May 2024, Sierra Agra first made available to MVP a digital data room containing documents related to Sierra Agra.

87. At least three of the documents transmitted to Plaintiffs via the data room contained misleading and omissive statements of material fact pertaining to the Facility's readiness to generate 2024 revenues.

88. Watson, as the CEO and co-founder of Sierra Agra, and Gorman, as the CFO and primary manager of the company's finances (including financial modeling), directed, supervised, and approved the contents of the documents transmitted to Plaintiffs through the data room.

89. In their executive roles, Watson and Gorman were responsible for ensuring that the operational milestones and financial assumptions conveyed to investors had a reasonable basis in existing fact.

90. The first misleading document is an "investor opportunity" deck dated February 2024 ("February Deck").

91. Slide 14 of the February Deck is titled "Summary Projected Income Statements." That slide depicts projected 2024 Sierra Agra revenue of $22,722,000.

COMPLAINT

4938-2980-8822

92. Slide 15 of the February Deck lists "major assumptions" to the projections—including that "Line 1 processing operations commence in May 2024" and "Line 2 processing commences in June 2024."

93. The second misleading document is another "investor opportunity" deck—this time dated June 2024 ("June Deck").

94. Slide 18 of the June Deck is titled "Summary Projected Income Statements." That slide depicts projected 2024 Sierra Agra revenue of $19,680,000.

95. Unlike the February Deck, the June Deck does not identify the "major assumptions" underlying Defendants' projections. However, the third misleading document appears to indicate the pertinent assumptions.

96. That third document is an Excel workbook ("June Workbook") containing numerous tabs.

97. The "Intro" tab identifies the June Workbook as the "Sierra Agra USA, LLC Financial Model Updated as of 20 June 2024."

98. Watson, as the CEO of Sierra Agra, and Gorman, as the CFO and primary manager of the company's finances (including financial modeling), directed, supervised, and approved the contents of the Sierra Agra financial models transmitted to Plaintiffs through the data room. In their executive roles, Watson and Gorman were responsible for ensuring that the financial assumptions and financial models conveyed to investors had a reasonable basis in existing fact.

99. The Intro tab of the June Workbook includes a list of "Major Assumptions/ Commentary." Item 1 on that list reads, in pertinent part: "Commissioning/processing operations commence in May 2024. Full operations in July 2024."

100. The "IS" tab of the June Workbook contains a detailed model for Sierra Agra's projected income statements. It identifies 2024 projected revenues of $19,679,834. That figure appears to be the source for the rounded $19,680,000 figure on Slide 18 of the June Deck.

101. When these three documents were conveyed to Plaintiffs in the spring of 2024, Sierra Agra, Watson, Gorman, and Revenaugh knew, for at least two reasons, that it was factually impossible to commence processing operations lawfully on the assumed timetables and that, as a

4938-2980-8822

result, it was impossible, *as a matter of then-present fact*, to generate the approximately $20 million in revenues reflected in the 2024 projections.

102. First, at the time the February Deck was made available to Plaintiffs, although Sierra Agra had largely completed installation work on Line 1, it had not applied for the numerous Permits required to operate at the Facility.

103. The process for obtaining the necessary Permits from the City would have included, among other things, (a) working with an architect or engineer to develop a full set of plans (including site plans and electrical, mechanical, and plumbing plans); (b) submitting the plans to the City for review; (c) waiting approximately 30 days for the City to conduct its review; (d) receiving and addressing any corrections or questions about code issues or problems in the submitted plans; (e) having the architect or engineer revise the plans; (f) submitting revised plans to the City; (g) waiting several weeks to receive confirmation from the City that the plans are acceptable; (h) having a City inspector physically inspect the Facility to make sure the work performed is consistent with the approved plans; and (i) receiving a certificate of occupancy from the City.

104. Defendants knew that the City process would be time-consuming (likely many months) and would preclude Sierra Agra from conducting lawful operations that would generate almost $23 million of 2024 revenues.

105. Defendants also knew that the City permitting process was not the only one that had to be completed. For instance, Sierra Agra had not completed the Sanitation District permitting process.

106. Indeed, as late as April 2024—during the Solicitation Period and after both Lines had been delivered and substantial alteration work performed—Sierra Agra had not meaningfully engaged the City regarding the required Permits. On April 23, 2024, Sierra Agra's plant manager reported internally to Watson that, in the course of merely attempting to obtain a permit for the boilers, "the city of Fowler is now aware that we exist," and asked Sierra Agra's management how it wished to "approach this."

///

- 14 -                                          COMPLAINT

4938-2980-8822

107.    Second, at the time the February Deck was made available to Plaintiffs, there were physical, systems-level reasons why Sierra Agra could not imminently commence commercial operations at the Facility.

108.    One example: At the time of Plaintiffs' investments, the Facility did not contain a monitoring well for wastewater discharge. It would have taken months to undertake the permitting and installation required to install a monitoring well.

109.    A second example: At the time of Plaintiffs' investments, the ammonia system to provide cold storage for juice concentrates was not installed, and it would have taken several months for that to happen.

110.    A third example: At the time of Plaintiffs' investments, Sierra Agra did not have access to the amount of power required to commercially operate the Facility, including to operate the ammonia system. To obtain the requisite amount of power would have required either (a) working directly with Pacific Gas & Electric (which would have taken at least a year) or (b) purchasing, permitting, and installing on-site "co-gen" equipment (which would have taken at least 90 days).

111.    A fourth and final example: At the time of Plaintiffs' investments, Sierra Agra had not installed the boiler required to run Line 2. To install that boiler, Sierra Agra needed to obtain an authority to construct from the Pollution Control District. Obtaining that authority and installing the boiler would have taken months.

112.    In short, Defendants knew—but never informed Plaintiffs during the Solicitation Period—that there was zero probability of commencing full-scale commercial operations on the timetable required to generate any significant revenues in 2024, let alone the millions of dollars in projected revenues touted in the investor opportunity decks provided to Plaintiffs to induce them to invest.

113.    On May 22, 2024, Watson hosted a videoconference with representatives of MVP and WTS. During that presentation, Watson talked in detail about the startup of operations in the fourth quarter of 2024 and reaching production and revenue levels sufficient to generate substantial free cash flow from operations in that quarter, with a significant increase going into the first half of

4938-2980-8822

2025.

114.    On May 23, 2024, Watson visited Austin, Texas and had dinner with representatives of MVP and WTS.

115.    During the May 23 dinner, Watson discussed the status of the Facility and stated with certainty that Sierra Agra would soon begin revenue-generating produce processing operations for multiple fruit and vegetable varietals.

116.    At the May 23 dinner, Watson failed to disclose that Sierra Agra did not have the Permits required to run the Lines and commence commercial operations.

117.    At the time of his May 23 statements, Watson knew that imminent revenue-generating production was a factual impossibility because of Sierra Agra's lack of Permits.

118.    On June 4, 2024, representatives of MVP—including Ben Davis—visited the Facility.

119.    Watson and Revenaugh (together with non-party Reed) showed off seemingly completed construction projects (including enhancements to the roof and cold storage room) and the installation of Line 1.

120.    Watson and Revenaugh represented that the Facility was in a state of imminent operational readiness.

121.    At no point during the June 4 visit or prior to Plaintiffs' investment did Watson or Revenaugh (or anyone else) divulge that the Facility improvements they were touting had been undertaken without obtaining the requisite Permits and that Sierra Agra could not commence commercial operations without obtaining such Permits.

122.    At no point during the June 4 visit or prior to Plaintiffs' investment did Watson or Revenaugh (or anyone else) divulge that the Facility was not commercially ready because, among other things, it lacked a monitoring well; did not have an installed ammonia system; did not have access to the requisite power supply; and did not have the boiler installed to operate Line 2.

123.    At other times during the June 4 visit, Watson and Revenaugh, together with other Sierra Agra representatives, discussed—directionally consistent with the projections in the investor opportunity decks—the projected financial implications of Sierra Agra's supposed imminent

COMPLAINT

4938-2980-8822

commercial readiness.

124.    With Revenaugh in attendance at the meeting, Watson verbally provided revenue and cash flow figures for the second half of 2024—i.e., the coming six months—clearly representing that Sierra Agra would shortly be processing fruits and vegetables into revenue-generating products.

125.    During the June 4 visit, Ben Davis and Chris Aydam sat in the conference room at Sierra Agra's offices with Watson, Revenaugh, and other team members. Revenaugh introduced himself as V.P. of Administration in charge of administrative matters, including permitting. Revenaugh introduced other team members, including Rebecca Scott, who detailed her interactions with regulators and on-site auditors regarding the FDA approvals necessary to process food. Revenaugh, Watson, and the rest of the team explained that the FDA permit was the final approval required for Sierra Agra to sell its products, and that it simply required operating safely and cleanly for a certain number of days. Neither Revenaugh nor anyone else mentioned that Sierra Agra had failed to apply for, much less receive, the multiple operating permits necessary for Sierra Agra to operate.

126.    At the time Watson conveyed those rosy financial projections on June 4, Watson and Revenaugh knew that Sierra Agra was not in position, and would not imminently be in position, to run processing operations lawfully at the Facility because Sierra Agra did not have, and had not yet applied for, numerous Permits, and had not completed and could not timely complete necessary improvements including installation of a monitoring well, an ammonia system, power supply, and the Line 2 boiler.

## V.    PLAINTIFFS' INVESTMENT

127.    MVP executed the UPA on September 13, 2024.

128.    On or about September 13, 2024, MVP wired $991,304.40 ("MVP Investment") to Sierra Agra.

129.    WTS executed the UPA, or counterparts thereof, in connection with three Closings held on or about September 20, 2024, September 27, 2024, and October 10, 2024.

///

- 17 -                                                    COMPLAINT

4938-2980-8822

130.    In connection with those Closings, WTS wired a total of $8,921,739.60 ("WTS Investment" and, together with the MVP Investment, "Plaintiffs' Investments") to Sierra Agra—specifically, $3,717,391.50 on or about September 20, 2024; $3,800,000.20 on or about September 27, 2024; and $1,404,347.90 on or about October 10, 2024.

131.    Each of MVP and WTS invested in Sierra Agra in significant part on the basis of (1) representations made by Sierra Agra in the UPA; (2) documents and information provided by Sierra Agra during the Solicitation Period, including the investor opportunity decks; and (3) statements made by Watson, Gorman, and Revenaugh on behalf of Sierra Agra during the Solicitation Period.

## VI.    THE TRUTH ABOUT SIERRA AGRA'S FAILURE TO OBTAIN PERMITS IS REVEALED

132.    On June 13, 2025, Watson and Gorman (individually and derivatively on behalf of Sierra Agra) filed a verified complaint ("Watson-Gorman Complaint") in California Superior Court, Case No. 25CECG02812. The Watson-Gorman Complaint is attached as **Exhibit 2**.

133.    In verifying the Watson-Gorman Complaint, Watson and Gorman each declared, under penalty of perjury, that the factual allegations in the Watson-Gorman Complaint are true.

134.    In the Watson-Gorman Complaint, Watson and Gorman admitted under penalty of perjury that there was a "failure to ensure SAUSA's compliance with essential municipal permits for its physical plant and operations." (Watson-Gorman Complaint ¶ 53.)[1]

135.    Watson and Gorman further admitted that they "repeatedly raised [with other insiders] this critical [permit] compliance failure . . . for approximately two years[.]" (Watson-Gorman Complaint ¶ 53.)

136.    They further admitted: "This non-compliance exposes [Sierra Agra] to significant legal penalties, fines, and the immediate risk of a forced operational shutdown by regulators." (Watson-Gorman Complaint ¶ 53.)

---

[1] For purposes of this complaint, it does not matter whether the allegations in the Watson-Gorman Complaint were true when alleged. What matters is that, in verifying the Watson-Gorman Complaint, Watson and Gorman declared that they were true—thereby affirming their personal knowledge of the factual allegations.

- 18 -                                      COMPLAINT

137.    They further admitted: "[O]btaining these permits is a necessary legal prerequisite for [Sierra Agra] to ship its products and generate revenue, and the failure to do so needlessly puts [Sierra Agra's] massive capital investment at risk." (Watson-Gorman Complaint ¶ 53.)

138.    Watson and Gorman further swore that the permit non-compliance they described placed at risk "approximately $45 million in capital expenditures and $11 million in tenant improvements reflected on [Sierra Agra's] balance sheet." By their own sworn account, then, Defendants understood that the very permits Sierra Agra lacked were essential to protecting tens of millions of dollars of invested capital—including Plaintiffs' Investments.

139.    In short, in June 2025, Watson and Gorman admitted that they knew "for approximately two years" that Sierra Agra's failure to obtain Permits constituted a compliance failure that put Sierra Agra's investors' funds at risk.

140.    It necessarily follows that, at the time of the UPA, Watson and Gorman knew—but failed to disclose to Plaintiffs—that Sierra Agra did not have the Permits required to commence commercial produce processing operations.

141.    On June 25, 2025, Sierra Agra received a Stop Work Order from the City for failure to apply for and obtain permits and licenses necessary to install the Lines and operate the Facility.

142.    The Stop Work Order prevents Sierra Agra from occupying or operating the Facility, bringing the Company's activities to a standstill.

143.    In February 2025, the Board instructed Sierra Agra's management team (which had replaced Watson and Gorman) to prepare an accurate revised budget identifying Sierra Agra's capital requirements for completing installation of the Lines and commencing revenue-generating produce processing.

144.    The budget produced from that effort revealed that Sierra Agra would require an estimated additional $12,000,000 to $18,000,000—on top of the approximately $14 million that Plaintiffs and other investors had already provided in the Offering—to make the Facility ready for commercial operations.

///

///

- 19 -                                                        COMPLAINT

4938-2980-8822

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT (EXPRESS WARRANTIES) - PERMITS**

(Sierra Agra)

145. Plaintiffs incorporate by reference all preceding paragraphs.

146. Plaintiffs and Sierra Agra entered into the valid, written UPA on or about September 13, 2024.

147. Plaintiffs performed all conditions, covenants, and obligations required of them under the UPA—including payment of Plaintiffs' Investments.

148. UPA ¶ 2.19 provides, in pertinent part: "The Company has or will have when necessary all permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a Material Adverse Effect."

149. UPA ¶ 2.19 was false when made. At the time of the UPA, Sierra Agra did not have the permits, licenses, and authorizations necessary for the conduct of its business. And contrary to the representation that Sierra Agra "will have [such permits] when necessary," Sierra Agra had not even applied for the numerous required Permits as of the UPA and could not have obtained them in time to conduct the imminent commercial operations that Defendants represented to Plaintiffs. Because Defendants represented that Sierra Agra would commence revenue-generating operations imminently—indeed, that operations had already commenced or would commence within weeks—the permits were "necessary" at or about the time of the UPA, and the representation that Sierra Agra "will have [them] when necessary" was therefore false when made.

150. The lack of those Permits could reasonably be expected to have, and did have, a Material Adverse Effect on Sierra Agra. Under UPA ¶ 1.5(y), "Material Adverse Effect" means "a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, or results of operations of [Sierra Agra]." As Watson and Gorman later swore under penalty of perjury, the permit non-compliance exposed Sierra Agra "to significant legal penalties, fines, and the immediate risk of a forced operational shutdown by regulators" and "needlessly put . . . [Sierra Agra's] massive capital investment at risk." That risk materialized on June 25, 2025, when the City issued the Stop Work Order that halted operations at the Facility and

COMPLAINT

4938-2980-8822

brought Sierra Agra's activities to a standstill.

151. The falsity of UPA ¶ 2.19 at the time of the UPA was confirmed by two separate events in 2025.

152. First, the falsity of UPA ¶ 2.19 was confirmed by the filing of the verified Watson-Gorman Complaint.

153. In that verified complaint, Watson and Gorman admitted under penalty of perjury that they had known of Sierra Agra's failure to obtain the required Permits "for approximately two years"—a period that necessarily encompassed the September 13, 2024 UPA. It therefore follows that, at the time of the UPA, Watson and Gorman knew that Sierra Agra had not obtained the Permits required to undertake commercial produce processing operations.

154. Second, the falsity of UPA ¶ 2.19 was confirmed by the City's imposition of the Stop Work Order due to Sierra Agra's failure to apply for and obtain required Permits.

155. As a direct and proximate result of Sierra Agra's breach of UPA ¶ 2.19, Plaintiffs have suffered damages in an amount to be proven at trial, including the loss of the value of their investments.

**SECOND CAUSE OF ACTION**

**BREACH OF CONTRACT (EXPRESS WARRANTIES) – WATSON PROPERTY**

(Sierra Agra)

156. Plaintiffs incorporate by reference all preceding paragraphs.

157. Plaintiffs and Sierra Agra entered into the valid, written UPA on or about September 13, 2024.

158. Plaintiffs performed all conditions, covenants, and obligations required of them under the UPA—including payment of Plaintiffs' Investments.

159. UPA ¶ 2.11(a) provides, in pertinent part: "[T]here are no agreements, understandings or proposed transactions between the Company and any of its officers, managers, consultants, or Key Employees, or any Affiliate thereof."

160. UPA ¶ 2.11(b) provides, in pertinent part: "None of the Company's managers, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing

COMPLAINT

4938-2980-8822

are, directly or indirectly, indebted to the Company[.]"

161.    On July 29, 2021, Watson and his wife purchased a residential property located at 2018 W. Green Acres Drive, Visalia, California (the "Green Acres Property"), for $1,005,000.

162.    Watson and his wife purchased the Green Acres Property to be their primary residence, and, upon information and belief, the Green Acres Property has been the primary residence of Watson and his wife at all times relevant to this complaint.

163.    Upon information and belief, Watson used Sierra Agra funds for all or part of the down payment on the purchase of the Green Acres Property.

164.    Upon information and belief, the Board did not approve Watson's use of Sierra Agra funds for the down payment on the Green Acres Property.

165.    Sometime after purchasing the Green Acres Property, Watson made improvements to an accessory dwelling unit on the property and used Sierra Agra funds to pay for those improvements.

166.    Sierra Agra's Disclosure Schedule to the UPA addressed the Green Acres Property only in part. Schedule 2.11(b) disclosed that "[i]n December 2023, the Company made advances of $25,000 and $35,000 to Chief Executive Officer, Wade Watson, for the construction finish of an Accessory Dwelling Unit at 2018 W. Green Acres Drive, Visalia, CA 93291," and represented that the dwelling "serves as alternate lodging for Company visitors, visiting officers and Board Managers of the Company, as well as Tropical Food Machinery engineers and technicians in country when the Company's Visalia staff house is fully occupied."

167.    The Disclosure Schedule did not disclose that Sierra Agra funds had been used toward the down payment on Watson's purchase of the Green Acres Property.

168.    Contrary to the Disclosure Schedule's representation that the accessory dwelling unit serves as lodging for Sierra Agra's visitors, officers, managers, and equipment technicians, Watson offers the outbuilding—marketed as a "poolside casita"—for short-term rental to the public on Airbnb for his own personal benefit.[2]

---

[2] https://www.airbnb.com/rooms/1077691466952783444?source_impression_id=p3_1769722985_P3B-AiD1B7rsvetk

- 22 -                                    COMPLAINT

4938-2980-8822

169.    In 2025, Watson admitted to using Sierra Agra funds and claimed that he would repay the funds to Sierra Agra upon the sale of the Green Acres Property at some unspecified future time.

170.    Watson's acknowledgment that he would repay Sierra Agra the down payment and improvement funds establishes that those funds were not, as represented on the Disclosure Schedule, company-purpose "advances," but rather an unwritten loan, with Sierra Agra as lender and Watson as borrower (the "Watson Loan"), under which Watson was and is indebted to Sierra Agra.

171.    Watson has not repaid Sierra Agra the funds used for the down payment on, or the improvements to, the Green Acres Property.

172.    Beyond the December 2023 advances disclosed on Schedule 2.11(b), neither Sierra Agra nor Watson disclosed to Plaintiffs, prior to their investments: (a) that Sierra Agra funds had been used toward the down payment on the Green Acres Property; (b) that the funds Sierra Agra provided to or for the benefit of Watson constituted a personal indebtedness that Watson was obligated to repay, rather than the company-purpose "advances" described on the Disclosure Schedule; or (c) that Watson would exploit the accessory dwelling unit for his own personal benefit by offering it for short-term public rental, rather than as the company lodging represented on the Disclosure Schedule.

173.    The undisclosed use of Sierra Agra funds toward the down payment on the Green Acres Property, together with the Watson Loan, constituted an agreement, understanding, or transaction between Sierra Agra and one of its officers that was not disclosed on the Disclosure Schedule and did not fall within any exception to UPA ¶ 2.11(a). UPA ¶ 2.11(a) was therefore false when made, and Sierra Agra was in breach of its representation that "there are no agreements, understandings or proposed transactions between the Company and any of its officers, managers, consultants, or Key Employees, or any Affiliate thereof."

174.    The undisclosed funds Sierra Agra provided toward the down payment on the Green Acres Property, together with the Watson Loan, rendered Watson "directly or indirectly, indebted to the Company" in amounts and in a manner not disclosed on the Disclosure Schedule. UPA ¶

- 23 -                                                    COMPLAINT

2.11(b) was therefore false when made, and Sierra Agra was in breach of its representation that "[n]one of the Company's managers, officers or employees, or any members of their immediate families, or any Affiliate of the foregoing are, directly or indirectly, indebted to the Company[.]"

175. As a direct and proximate result of Sierra Agra's breach of UPA ¶ 2.11(a), Plaintiffs have suffered damages in an amount to be proven at trial, including the loss of the value of their investments.

176. As a direct and proximate result of Sierra Agra's breach of UPA ¶ 2.11(b), Plaintiffs have suffered damages in an amount to be proven at trial, including the loss of the value of their investments.

**THIRD CAUSE OF ACTION**

**BREACH OF CONTRACT (EXPRESS WARRANTIES) – HYDE AGREEMENT**

(Sierra Agra)

177. Plaintiffs incorporate by reference all preceding paragraphs.

178. Plaintiffs and Sierra Agra entered into the valid, written UPA on or about September 13, 2024.

179. Plaintiffs performed all conditions, covenants, and obligations required of them under the UPA—including payment of Plaintiffs' Investments.

180. UPA ¶ 2.2(c) provides: "[T]here are no . . . agreements, orally or in writing, to purchase or acquire from the Company any Units, or any securities convertible into or exchangeable for Units."

181. That representation was false when made.

182. On September 21, 2021, Sierra Agra and Farm Credit West, PCA entered into an Equipment Finance Agreement and certain ancillary agreements (collectively, "AgWest Agreement").

183. Subsequently, Gorman approached Sierra Agra Board member Brian Hyde ("Hyde") about encumbering Hyde's family ranch ("Hyde Ranch") as collateral in connection with the AgWest Agreement.

///

- 24 -                                                                 COMPLAINT

4938-2980-8822

184.    Hyde agreed to offer the Hyde Ranch for that purpose on the condition that Sierra Agra issue Hyde additional Sierra Agra units.

185.    Gorman agreed, on behalf of Sierra Agra, that Sierra Agra would issue Hyde additional Sierra Agra units in exchange for the pledge of the Hyde Ranch—an initial number of units upon the encumbrance of the Hyde Ranch and additional units thereafter until Sierra Agra was able to refinance the AgWest Agreement in a manner that released the encumbrance on the Hyde Ranch (the "Hyde Agreement"). Upon information and belief, the Hyde Agreement obligated Sierra Agra to issue Hyde at least twelve (12) and as many as thirty (30) additional Common units.

186.    The Hyde Agreement was never memorialized in writing.

187.    The Hyde Agreement was not disclosed on Sierra Agra's Disclosure Schedule to the UPA. Although the Disclosure Schedule identified certain other agreements and rights to acquire Sierra Agra units, it did not identify the Hyde Agreement among "the securities and rights described in Subsection 2.2(c) of the Disclosure Schedule" or otherwise, and the Hyde Agreement therefore fell within none of the exceptions to the representation in UPA ¶ 2.2(c).

188.    On November 16, 2023, in reliance on the Hyde Agreement, Hyde and his fellow owners of the Hyde Ranch executed a Deed of Trust and Assignment of Rents encumbering the Hyde Ranch in connection with the AgWest Agreement.

189.    Gorman and Watson were aware of the Hyde Agreement at the time of the UPA.

190.    Upon information and belief, the existence of the Hyde Agreement was confirmed in or about January 2025, when Hyde notified Sierra Agra's Board that Sierra Agra had a pre-existing obligation to issue him additional units in exchange for his pledge of the Hyde Ranch—an obligation that pre-dated Plaintiffs' investments and had not been disclosed to them.

191.    The Hyde Agreement is an oral agreement to acquire units from Sierra Agra.

192.    The Hyde Agreement was in effect at the time of the UPA.

193.    It follows that, at the time of the UPA, it was false for Sierra Agra to represent, in ¶ 2.2(c), that "there are no . . . agreements, orally or in writing, to purchase or acquire from the Company any Units, or any securities convertible into or exchangeable for Units."

///

COMPLAINT

4938-2980-8822

194. As a direct and proximate result of Sierra Agra's breach of UPA ¶ 2.2(c), Plaintiffs have suffered damages in an amount to be proven at trial, including the loss of the value of their investments.

**FOURTH CAUSE OF ACTION**

**BREACH OF CONTRACT (EXPRESS WARRANTIES) – AGWEST DEFAULT**

(Sierra Agra)

195. Plaintiffs incorporate by reference all preceding paragraphs.

196. Plaintiffs and Sierra Agra entered into the valid, written UPA on or about September 13, 2024.

197. Plaintiffs performed all conditions, covenants, and obligations required of them under the UPA—including payment of Plaintiffs' Investments.

198. UPA ¶ 2.9 provides, in pertinent part: "The Company is not in violation or default . . . (iii) under any note, indenture or mortgage . . . to the extent any such violation of or default . . . would reasonably be expected to have a Material Adverse Effect."

199. UPA ¶ 2.9 was false when made. At the time of the UPA, Sierra Agra was in default under the AgWest Agreement because it had failed to obtain the governmental permits, licenses, and consents required for the installation, construction, operation, and use of the financed Equipment, and that default could reasonably be expected to have a Material Adverse Effect on Sierra Agra.

200. The AgWest Agreement is comprised of numerous documents. One of the documents includes the following language: "The occurrence of any of the following events shall constitute an event of default by [Sierra Agra] under this Agreement: . . . g) [Sierra Agra] . . . fails to obtain any governmental permits, licenses, or consents as may be required by applicable law or regulation for the installation, construction, operation, and use of the Equipment[.]"

201. As of the time of the UPA, and in the intervening period, Sierra Agra failed to obtain required Permits—as evidenced by, among other things, (1) the Watson-Gorman Complaint and (2) the Stop Work Order.

///

- 26 -

COMPLAINT

4938-2980-8822

202. It follows that Sierra Agra was, at the time of the UPA, in default of the AgWest Agreement.

203. The AgWest Agreement is a "note" within the meaning of UPA ¶ 2.9(iii). In the alternative, the AgWest Agreement is an "agreement" or "contract" to which Sierra Agra is a party and by which it is bound that is required to be listed on, and that is in fact listed on, the Disclosure Schedule, within the meaning of UPA ¶ 2.9(iv). Sierra Agra's default under the AgWest Agreement therefore fell within UPA ¶ 2.9.

204. Under UPA ¶ 1.5(y), "Material Adverse Effect" means "a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, or results of operations of [Sierra Agra]."

205. Sierra Agra's default under the AgWest Agreement could reasonably be expected to have, and did have, a Material Adverse Effect on Sierra Agra. The AgWest Agreement secured a loan of approximately $15,075,000 and was secured by the equipment constituting the Lines. A default exposed Sierra Agra to acceleration of that indebtedness and loss of the financed equipment—and thus the loss of any means of processing produce to generate revenue—which would constitute a material adverse effect on the business, assets, financial condition, and results of operations of Sierra Agra. As Watson and Gorman later swore under penalty of perjury, the same permit non-compliance that placed Sierra Agra in default "needlessly put . . . [Sierra Agra's] massive capital investment at risk."

206. Accordingly, it was false for Sierra Agra to represent, in UPA ¶ 2.9, that "[t]he Company is not in violation or default . . . (iii) under any note, indenture or mortgage . . . to the extent any such violation of or default . . . would reasonably be expected to have a Material Adverse Effect."

207. As a direct and proximate result of Sierra Agra's breach of UPA ¶ 2.9, Plaintiffs have suffered damages in an amount to be proven at trial, including the loss of the value of their investments.

///

///

- 27 -                                                    COMPLAINT

4938-2980-8822

**FIFTH CAUSE OF ACTION**

**BREACH OF CONTRACT (EXPRESS WARRANTIES) – LEASE DEFAULT**

(Sierra Agra)

208.    Plaintiffs incorporate by reference all preceding paragraphs.

209.    Plaintiffs and Sierra Agra entered into the valid, written UPA on or about September 13, 2024.

210.    Plaintiffs performed all conditions, covenants, and obligations required of them under the UPA—including payment of Plaintiffs' Investments.

211.    UPA ¶ 2.13 provides, in pertinent part: "With respect to property and assets it leases, the Company is in compliance with such leases and, to its knowledge, holds a valid leasehold interest free of any liens, claims or encumbrances other than those of the lessors of such property or assets."

212.    UPA ¶ 2.13 was false when made. At the time of the UPA, Sierra Agra was not in compliance with its lease of the Facility because it had failed to pay rent and other expenses due under that lease beginning in early 2024—months before Plaintiffs executed the UPA and made their investments.

213.    Beginning in or about early 2024, Sierra Agra failed to pay rent and other expenses owed under its triple-net lease of the Facility, and that non-compliance existed and was continuing as of the September 13, 2024 UPA.

214.    The existence of that pre-UPA default was confirmed on or about July 15, 2025, when Reed notified Sierra Agra's Board that Sierra Agra was in default of its rent obligations under the lease and had failed to pay expenses since the beginning of 2024—that is, before Plaintiffs' execution of the UPA.

215.    Accordingly, it was false for Sierra Agra to represent, in UPA ¶ 2.13, that Sierra Agra was "in compliance with [its] leases[.]" (UPA ¶ 2.13)

216.    As a direct and proximate result of Sierra Agra's breach of UPA ¶ 2.13, Plaintiffs have suffered damages in an amount to be proven at trial, including the loss of the value of their investments.

4938-2980-8822

**SIXTH CAUSE OF ACTION**

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT**

**AND RULE 10b-5 PROMULGATED THEREUNDER**

(Sierra Agra, Watson, Gorman, and Revenaugh)

217.   Plaintiffs incorporate by reference all preceding paragraphs.

218.   **The fraudulent scheme**. During the Solicitation Period, Defendants Sierra Agra, Watson, Gorman, and Revenaugh carried out a plan, scheme, and course of conduct which was intended to and did: (a) deceive Plaintiffs regarding Sierra Agra's readiness to lawfully conduct revenue-generating commercial produce processing operations at the Facility; and (b) cause Plaintiffs to purchase Select 2023-B membership units in reliance on false or misleading information. In furtherance of this unlawful scheme, Defendants made material misrepresentations and omissions of fact, including as set forth below.

219.   **Material Misrepresentations and Omissions**. Sierra Agra, Watson, Gorman, and Revenaugh each acting with scienter, made untrue statements of material fact and/or omitted material facts necessary to make statements made not misleading.

220.   In the February Deck, June Deck, and June Workbook transmitted to Plaintiffs in the spring of 2024, Defendants presented assumptions that Line 1 and Line 2 processing operations would commence between May and July 2024.

221.   In a series of in-person meetings in May and June, Watson and Revenaugh assured Plaintiffs that Sierra Agra was in position to commence operations as soon as Plaintiffs made their contemplated investment.

222.   At the time, Defendants knew, as a matter of then-present fact, this was a legal, technical, and financial impossibility because (1) Sierra Agra had not applied for the Permits required to operate commercially and the permitting process would take months and (2) Sierra Agra had numerous outstanding months-long Facility improvements necessary to conduct commercial operations.

223.   Moreover, Sierra Agra represented in the September 13, 2024 UPA that it "has or will have when necessary all permits, licenses and any similar authority necessary for the conduct

4938-2980-8822

of its business, the lack of which could reasonably be expected to have a Material Adverse Effect."

224. Sierra Agra, Watson, Gorman, and Revenaugh knew, as of that time, that it would require months of further effort to secure applicable Permits and that there would be no way for Sierra Agra to do so to generate millions of dollars of revenues in 2024.

225. **Strong Inference of Scienter**. Defendants Watson, Gorman, and Revenaugh acted with actual knowledge that their statements were false or with deliberate recklessness as to their truth. As to Watson and Gorman, scienter is established by, among other things: (a) their positions as Sierra Agra's CEO and CFO, with ultimate oversight of and responsibility for the Company's permitting, financial modeling, and investor-solicitation processes; (b) their sworn admissions, in the verified Watson-Gorman Complaint, that the permit non-compliance was a "critical compliance failure" of which they had been aware "for approximately two years"—a period encompassing the Solicitation Period and the September 13, 2024 UPA; and (c) the fact that, as late as April 2024, Sierra Agra had not meaningfully engaged the City, which had only then become "aware that we exist." The inference that Watson and Gorman knew their representations of imminent, revenue-generating operations were false is at least as compelling as any innocent explanation.

226. As to Revenaugh, scienter is established by, among other things: (a) his position as V.P. of Administration responsible for Sierra Agra's administrative matters, including permitting; (b) his direct, documented involvement, beginning in 2022, in the boiler and electrical-power workstreams that required governmental authorizations Sierra Agra had not obtained; (c), upon information and belief, his access to and monitoring of Company-wide email communications, including communications concerning the Company's permitting status; and (d) his personal participation in the June 4, 2024 meeting, at which he represented that the FDA permit was the final approval Sierra Agra needed, while failing to disclose that Sierra Agra had not applied for—much less obtained—the multiple operating permits required to operate the Facility. Revenaugh's representation that only a single, final approval remained, when he knew or recklessly disregarded that numerous permits had not even been applied for, supports a strong inference that he acted with scienter.

///

- 30 -                                        COMPLAINT

227.   **Justifiable Reliance**. Plaintiffs reasonably and justifiably relied on the Defendants' misrepresentations and omissions. Had Plaintiffs known the truth regarding the lack of Permits and the legal and factual impossibility of the stated production and revenue-generation timelines, they would not have purchased the Sierra Agra units.

228.   **Loss Causation**. Plaintiffs' losses were directly and proximately caused by the materialization of the very risk Defendants concealed—Sierra Agra's lack of the Permits required to operate lawfully. That concealed condition was revealed through the June 13, 2025 verified Watson-Gorman Complaint and, on June 25, 2025, through the City's issuance of the Stop Work Order, which halted operations at the Facility and brought Sierra Agra's activities to a standstill. The resulting inability to commence the revenue-generating operations on which Plaintiffs' investment depended caused the loss of the value of Plaintiffs' Investments.

229.   **Interstate Commerce**. The fraudulent scheme occurred "in connection with" the purchase and sale of securities using the means and instrumentalities of interstate commerce. Defendants transmitted materials to Plaintiffs across state lines using email and other electronic communications transmitted in interstate commerce. Defendants conducted telephone and videoconference calls with Plaintiffs across state lines. Plaintiffs transmitted their investment funds via interstate wire transfer.

230.   Accordingly, Sierra Agra, Watson, Gorman, and Revenaugh each violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

<u>**SEVENTH CAUSE OF ACTION**</u>

**VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**

(Watson, Gorman, and Revenaugh)

231.   Plaintiffs incorporate by reference all preceding paragraphs.

232.   Section 20(a) of the Exchange Act [15 U.S.C. § 78t] provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable[.]"

- 31 -                                    COMPLAINT

4938-2980-8822

233. At all times relevant to this complaint, defendants Watson, Gorman, and Revenaugh directly or indirectly controlled Sierra Agra in the manner contemplated by Section 20(a).

234. By virtue of their Board and executive positions, participation in and awareness of Sierra Agra's operations, and knowledge of the false statements made by Sierra Agra and disseminated to Plaintiffs, Watson and Gorman had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Sierra Agra—including, without limitation, the content and dissemination of Sierra Agra's false and misleading statements to Plaintiffs prior to Plaintiffs' investments.

235. Revenaugh was also a controlling person of Sierra Agra within the meaning of Section 20(a). As Sierra Agra's V.P. of Administration responsible for the Company's administrative matters—including permitting—Revenaugh exercised direct and indirect control over the administrative and operational functions of Sierra Agra and over the information concerning the Company's permitting status that was conveyed to Plaintiffs. Revenaugh served as Watson's operational point person and, upon information and belief, monitored Company-wide communications, including communications concerning the Company's permitting status, and used that access to influence and convey information to Plaintiffs and others on the Company's behalf.

236. As set forth above, Sierra Agra violated Exchange Act Section 10(b) and Rule 10b-5 promulgated thereunder by making false and misleading statements to Plaintiffs to induce their investments in Sierra Agra. By virtue of their positions as Sierra Agra controlling persons, Watson, Gorman, and Revenaugh are liable under Exchange Act Section 20(a).

237. As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs suffered damages in an amount to be determined at trial.

**EIGHTH CAUSE OF ACTION**

**COMMON LAW FRAUD**

(Sierra Agra, Watson, Gorman, and Revenaugh)

238. Plaintiffs incorporate by reference all preceding paragraphs.

239. **The Fraudulent Scheme**. During the Solicitation Period, Defendants Sierra Agra, Watson, Gorman, and Revenaugh carried out a plan, scheme, and course of conduct which was

- 32 -

4938-2980-8822

intended to and did: (a) deceive Plaintiffs regarding Sierra Agra's readiness to lawfully conduct revenue-generating commercial produce processing operations at the Facility; and (b) induce Plaintiffs to purchase Select 2023-B membership units in reliance on misleading information. In furtherance of this unlawful scheme, Defendants made material misrepresentations and omissions of fact, including as set forth below.

240.    **Material Misrepresentations and Omissions**. Sierra Agra, Watson, Gorman, and Revenaugh, each acting with knowledge of falsity or reckless disregard for the truth, made untrue statements of material fact and/or omitted material facts necessary to make statements made not misleading.

241.    In the February Deck, June Deck, and June Workbook transmitted to Plaintiffs in the spring of 2024, Defendants presented assumptions that Line 1 and Line 2 processing operations would commence between May and July 2024.

242.    During the May 22, 2024 videoconference, the May 23, 2024 dinner, and the June 4, 2024 Facility tour, Defendant Watson affirmatively represented that the Facility was in a state of imminent or turnkey operational readiness and would be generating revenue in the immediate coming months.

243.    Defendant Revenaugh sat in and led portions of the June 4, 2024 meeting and Facility tour, affirmatively representing that the Facility was in a state of imminent or turnkey operational readiness and would be generating revenue in the immediate coming months.

244.    At the time, Defendants knew, as a matter of then-present fact, this was a legal, technical, and financial impossibility because (a) Sierra Agra had not applied for the Permits required to operate commercially and the permitting process would take months; (b) Sierra Agra had numerous outstanding months-long Facility improvements necessary to conduct commercial operations; and (c) Sierra Agra needed to invest millions of additional dollars in capital expenditures to finalize the Facility and commence generating meaningful revenue.

245.    Moreover, Sierra Agra represented in the September 13, 2024 UPA that it "has or will have when necessary all permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a Material Adverse Effect."

4938-2980-8822

246.    Sierra Agra, Watson, Gorman, and Revenaugh knew, as of that time, that it would require months of further effort to secure applicable Permits and that there would be no way for Sierra Agra to do so to generate millions of dollars of revenues in 2024.

247.    **Intent to Induce Reliance**. Defendants made these misrepresentations and omissions with the intent to induce Plaintiffs to rely upon them and to invest capital into Sierra Agra. Each Defendant personally benefitted from this conduct through the enhancement of their equity interests and the continuation of their employment and compensation funded by Plaintiffs' investment.

248.    **Knowledge of Falsity and Scienter**. Defendants Watson, Gorman, and Revenaugh acted with actual knowledge that their statements were false, or with reckless disregard for their truth. As to Watson and Gorman, knowledge is established by their positions as Sierra Agra's CEO and CFO and by their sworn admissions, in the verified Watson-Gorman Complaint, that the permit non-compliance was a "critical compliance failure" of which they had been aware "for approximately two years." As to Revenaugh, knowledge is established by his position as V.P. of Administration responsible for permitting, his documented involvement in the boiler and power workstreams that required unobtained governmental authorizations, his access to and monitoring of Company communications concerning permitting, and his personal representation at the June 4, 2024 meeting that the FDA permit was the final approval Sierra Agra needed—when he knew that Sierra Agra had not applied for the multiple operating permits required to operate.

249.    **Justifiable Reliance**. Plaintiffs actually, reasonably, and justifiably relied on Defendants' misrepresentations and omissions—including the projections and assumptions in the February Deck, June Deck, and June Workbook, and the representations made by Watson and Revenaugh during the May and June 2024 presentations and the June 4, 2024 Facility tour—in deciding to purchase the Select 2023-B units. Had Plaintiffs known the truth regarding the lack of Permits and the legal and factual impossibility of the stated production and revenue-generation timelines, they would not have purchased the units.

250.    **Damage and Causation**. Plaintiffs' damages were directly and proximately caused by the materialization of the concealed risks. The June 2025 Stop Work Order was the direct result

COMPLAINT

4938-2980-8822

of the unpermitted status Defendants concealed. This regulatory shutdown rendered the Plaintiffs' investment worthless and caused the total loss of their capital.

251.    **Punitive Damages**. The aforementioned acts of Sierra Agra, Watson, Gorman, and Revenaugh were done willfully, maliciously, and with the intent to defraud Plaintiffs. Defendants acted with oppression, fraud, or malice, and with conscious disregard of Plaintiffs' rights, thereby justifying an award of exemplary and punitive damages pursuant to California Civil Code section 3294. The wrongful conduct of Sierra Agra was committed, authorized, and ratified by its officers and managing agents, including Watson and Gorman.

### NINTH CAUSE OF ACTION

### VIOLATION OF CAL. SECURITIES ACT—FRAUDULENT PRACTICES

(Sierra Agra)

[Cal. Corp. Code §§ 25401 and 25501]

252.    Plaintiffs incorporate by reference all preceding paragraphs.

253.    California Corporations Code section 25401 provides that it is unlawful for any person to offer or sell a security by means of any written or oral communication that includes an untrue statement of material fact or omits to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

254.    California Corporations Code section 25501 provides the civil remedy for a violation of section 25401, entitling a purchaser who buys a security from a person who violated section 25401 to recover the consideration paid, together with interest, upon tender of the security, or damages if the purchaser no longer owns the security.

255.    The Select 2023-B membership units are "securities" within the meaning of California Corporations Code section 25019.

256.    **The Fraudulent Offer and Sale**. Sierra Agra offered and sold the Select 2023-B membership units to Plaintiffs by means of written and oral communications—including the February Deck, the June Deck, the June Workbook, verbal presentations in May and June 2024, and the UPA—that contained untrue statements of material fact and omitted material facts.

///

4938-2980-8822

257.    **Misrepresentations of Existing Fact**. Sierra Agra offered and sold the Select 2023-B units to Plaintiffs by means of the written and oral communications described above—including the February Deck, the June Deck, the June Workbook, the May and June 2024 verbal presentations, and the UPA—each of which contained untrue statements of material fact and omitted material facts necessary to make the statements made not misleading. These communications were false and misleading because they represented that commercial operations at the Facility could and would commence imminently so as to generate tens of millions of dollars of revenues in 2024, when, as of the time of these communications, Sierra Agra had not applied for the Permits required to operate the Facility, the permitting process carried a significant known lead time, and the Facility required substantial, months-long improvements that had not been completed.

258.    **The UPA Misrepresentations**. Sierra Agra further violated Section 25401 by representing in the September 13, 2024 UPA that it possessed or would possess all necessary permits.

259.    **Materiality**. The aforementioned misrepresentations and omissions were material because a reasonable investor would consider the legal authority and technical ability to operate Facility essential to the decision to invest.

260.    **Statutory Remedy**. Pursuant to California Corporations Code section 25501, Sierra Agra is liable to Plaintiffs for the total consideration paid for the Select 2023-B membership units, plus interest at the legal rate, less the amount of any income received on the security, upon the tender of such security.

**TENTH CAUSE OF ACTION**

**VIOLATION OF CAL. SECURITIES ACT—CONTROL PERSON LIABILITY**

(Watson, Gorman, and Revenaugh)

[Cal. Corp. Code §§ 25504 and 25501]

261.    Plaintiffs incorporate by reference all preceding paragraphs.

262.    California Corporations Code section 25504 provides that every person who directly or indirectly controls a person liable under section 25501 (which incorporates liability for fraudulent practices under section 25401), and every principal executive officer or director of a

4938-2980-8822

person so liable, is also liable jointly and severally with and to the same extent as such controlled person.

263. **Status as Control Persons**. At all relevant times, Watson served as the CEO and a member of the Board of Sierra Agra, Gorman served as the CFO and a member of the Board of Sierra Agra, and Revenaugh served as V.P. of Administration of Sierra Agra. In these capacities, Watson, Gorman, and Revenaugh exercised direct and indirect control over the day-to-day operations, financial modeling, permitting compliance, investor solicitations, and administrative activities of Sierra Agra.

264. **Material Aid in the Fraudulent Sale**. Watson, Gorman, and Revenaugh each materially aided Sierra Agra in the fraudulent offer and sale of the Select 2023-B units. As alleged more fully above, Watson and Gorman: (a) directed, supervised, and approved the dissemination of the February Deck, June Deck, and June Workbook, which they knew contained impossible assumptions regarding commercial readiness and revenues; (b) served as primary points of contact for Plaintiffs during the due diligence process and were responsible for the contents of the digital data room; (c) participated in the drafting and approval of the UPA, including the false representations and warranties contained therein; and (d) made verbal misrepresentations to Plaintiffs as detailed above. Revenaugh materially aided the offer and sale by, among other things, personally presenting to Plaintiffs at the June 4, 2024 meeting and Facility tour that Sierra Agra was in a state of imminent operational readiness and that the FDA permit was the final approval Sierra Agra needed, while concealing that Sierra Agra had not applied for the multiple operating permits required to operate the Facility.

265. **Direct Control over Deceptive Communications**. Watson and Gorman had ultimate control over the information conveyed to Plaintiffs, including determining which assumptions and financial data to include in the transmitted materials. Revenaugh, in his role as V.P. of Administration responsible for permitting and administrative matters, exercised control over, and personally conveyed, information provided to Plaintiffs concerning Sierra Agra's operational and permitting readiness.

///

COMPLAINT

4938-2980-8822

266. **Actual Knowledge of Underlying Facts**. Watson, Gorman, and Revenaugh had actual knowledge of the facts giving rise to Sierra Agra's primary liability under Sections 25401 and 25501. Their knowledge is established by their executive oversight and, in Watson and Gorman's case, their sworn admissions in the Watson-Gorman Complaint.

267. **No Reasonable Grounds for Ignorance**. Given their roles as CEO, CFO, and V.P. of Administration, respectively, and their direct involvement in facts at issue, Watson, Gorman, and Revenaugh cannot establish that they had no knowledge of, or reasonable grounds to believe in the existence of, the facts by reason of which Sierra Agra's liability is alleged to exist.

268. **Joint and Several Liability**. Pursuant to California Corporations Code section 25504, Watson, Gorman, and Revenaugh are jointly and severally liable with Sierra Agra for restitution of the total consideration paid by Plaintiffs for their membership units, plus interest at the legal rate.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

**On the First, Second, Third, Fourth, and Fifth Causes of Action (Breach of Contract) against Sierra Agra:**

a. For compensatory damages according to proof at trial, including the loss of the value of Plaintiffs' Investments, in an amount not less than $9,913,044.00;

**On the Sixth Cause of Action (Section 10(b) and Rule 10b-5) against Sierra Agra, Watson, Gorman, and Revenaugh, and on the Seventh Cause of Action (Section 20(a)) against Watson, Gorman, and Revenaugh:**

b. For compensatory damages according to proof at trial, in an amount not less than $9,913,044.00, together with prejudgment interest, against Defendants jointly and severally to the extent provided by law;

**On the Eighth Cause of Action (Common Law Fraud) against Sierra Agra, Watson, Gorman, and Revenaugh:**

c. For compensatory damages according to proof at trial, in an amount not less than $9,913,044.00;

4938-2980-8822

d.      For exemplary and punitive damages pursuant to California Civil Code section 3294, in an amount sufficient to punish and deter Defendants' conduct;

**On the Ninth Cause of Action (Cal. Corp. Code §§ 25401 & 25501) against Sierra Agra, and on the Tenth Cause of Action (Cal. Corp. Code §§ 25504 & 25501) against Watson, Gorman, and Revenaugh:**

e.      For rescission and recovery of the total consideration Plaintiffs paid for the Select 2023-B units—not less than $9,913,044.00—together with interest at the legal rate from the date of payment, less the amount of any income received on the units, upon tender of the units, pursuant to California Corporations Code section 25501; and for the joint and several liability of Watson, Gorman, and Revenaugh with Sierra Agra for that amount pursuant to California Corporations Code section 25504;

**On All Causes of Action:**

f.      For prejudgment interest as allowed by law;

g.      For postjudgment interest as allowed by law;

h.      For reasonable and necessary attorneys' fees to the extent allowed by law;

i.      For costs of suit; and

j.      For such other and further relief, general and special, at law or in equity, as the Court deems just and proper.

Dated: June 22, 2026                          SNELL & WILMER L.L.P.


By: */s/ Howard M. Privette*
Howard M. Privette
Jason Spitalnick (*pro hac vice forthcoming*)
Justin F. Mello

*Attorneys for Plaintiffs Midnight VP Fund I, L.P. and Worth the Squeeze L.P.*

4938-2980-8822

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a jury trial on all issues so triable.


Dated:  June 22, 2026                                    SNELL & WILMER L.L.P.


                                                         By: */s/ Howard M. Privette*
                                                         Howard M. Privette
                                                         Jason Spitalnick (*pro hac vice forthcoming*)
                                                         Justin F. Mello

                                                         *Attorneys for Plaintiffs Midnight VP Fund I,*
                                                         *L.P. and Worth the Squeeze L.P.*

COMPLAINT

4938-2980-8822